1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8  LARRY BARICH, a shareholder, on
   behalf of ENERGY SAVINGS
9  MANAGEMENT SYSTEMS, INC., a
   Washington Corporation,

   No.

10                                           COMPLAINT FOR DECLARATORY
                                Plaintiff,   JUDGMENT, INJUNCTIVE RELIEF,
11                                           AND DAMAGES

12     v.                                    DEMAND FOR JURY TRIAL

13 VARYWELL, LLC, a Washington limited
   liability corporation; WILLIAM
14 HICKNER, JASON HICKNER and
   RYAN HICKNER, individuals,

15                              Defendants.

16

17     Plaintiff LARRY BARICH, a shareholder, on behalf of ENERGY SAVINGS

18 MANAGEMENT SYSTEMS, INC., a Washington Corporation, by its attorneys, for its

19 complaint against defendants VARYWELL, LLC, a Washington limited liability corporation,

20 and WILLIAM HICKNER, JASON HICKNER, and RYAN HICKNER, individuals,

21 hereinafter alleges as follows, with knowledge concerning its own acts and upon information

22 and belief as to all other allegations:

23                              **THE PARTIES**

24     1.    Plaintiff LARRY BARICH ("Larry") is a Washington resident, and a

25 shareholder in and founder and officer of ENERGY SAVINGS MANAGEMENT SYSTEMS,

26 INC.

COMPLAINT - 1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580

2.      ENERGY SAVINGS MANAGEMENT SYSTEMS, INC. ("ESMS") is a corporation organized and existing under the laws of the Washington, having a principal place of business in Mukilteo, Washington.

3.      Defendant VARYWELL, LLC ("VaryWell") is a limited liability corporation organized and existing under the laws of the State of Washington, having a principal place of business in Seattle, Washington.

4.      Defendant WILLIAM HICKNER ("Bill" or "Bill Hickner") is a Washington resident.  Bill is a shareholder in and founder, and was an officer, of ESMS.  Bill is the father of defendants Jason and Ryan Hickner.

5.      Defendant JASON HICKNER ("Jason") is a Washington resident.  Jason is a founder of and manager in defendant VaryWell.

6.      Defendant RYAN HICKNER ("Ryan") is a Washington resident.  Ryan also is a founder of and manager in defendant VaryWell.  (Jason Hickner and Ryan Hickner are sometimes collectively referred to as the "Hickner Brothers.")

**JURISDICTION AND VENUE**

7.      This complaint seeks declaratory, injunctive, and monetary relief, for defendants' violations of federal statutes, Washington statutes, and Washington common law.

8.      This Court has subject matter jurisdiction over the claims that relate to copyright ownership and authorship and to unfair competition under the Lanham Act pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1400.

9.      This Court has supplemental jurisdiction over the claims that arise under the statutory and the common law of the State of Washington pursuant to 28 U.S.C. § 1367 and under principles of pendant jurisdiction.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because defendants regularly conduct business in this Judicial District; defendants have substantial contacts with and/or may be found in this Judicial District; a substantial portion of the events

COMPLAINT - 2

1  at issue have arisen and continue to occur in this Judicial District; and defendants have

2  committed the tortious acts complained of herein in this Judicial District, among others.

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

**ESMS Is Formed and Identifies an Exploitable Niche**

5        11.      Larry Barich and Bill Hickner formed what would eventually become ESMS in

6  1998, with the goal of creating a reliable, cost-effective, and easy-to-use energy management

7  system for the fast food industry (referred to by the industry as quick service restaurants, or

8  QSRs).

9        12.      Historically, energy management in the QSR market was difficult.  Few

10  solutions were available and all suffered from cumbersome interfaces that required a trained

11  technician to configure.  Since most small businesses could not afford to keep a technician on

12  the payroll, energy management remained out of reach for the majority of QSRs.

13        13.      Larry and Bill knew that the quick service restaurant market needed a different

14  sort of system; ideally, one that would virtually run itself.  Such a system would have to be

15  intelligent under the surface and externally easy-to-use and intuitive.  In contrast to the cryptic

16  interfaces of existing systems, this new solution would need to be clearly understood and

17  simple to operate by the average QSR employee.

18        14.      Against this background, Larry and Bill began research and development of

19  their initial product.  Their search led them to Energy Control Systems, Inc. ("ECS"), a

20  controls company that offered an HVAC controller for the hospitality industry.  Based on

21  Larry and Bill's input, and with some custom tailoring from ECS, ECS adapted its controller

22  to function in the QSR industry.  The customization included developing additional lighting

23  schedules, improvements to the customer interface, and the addition of some operational

24  features required by McDonald's restaurants, to which ESMS sold many of the control

25  systems.  The system they eventually developed around this controller met with great success,

26  and ESMS secured a distribution agreement with ECS for its controller.

COMPLAINT - 3

15.     Over the years, ESMS consistently improved its offering, gaining valuable field experience.  By 2006, it had installed over 800 systems in 40 states across the U.S., saving over 120MW and millions of dollars for its customers.

16.     Larry and Bill felt that although the ECS controller was a functional energy management system, ESMS needed to develop its own product, a custom solution developed from the outset just for the quick service restaurant and small commercial market.

17.     The decision to move in this direction was a result of several factors.  First, ESMS was purely acting as a sales force for the ECS controller.  Second, ESMS felt it would make sense to develop its own product from scratch, instead of attempting to remodel an existing product that ESMS did not own.  The final trigger occurred in late 2006 and early 2007, at which point ESMS was in negotiations with a subsidiary of Schneider Electric, TAC.  TAC wanted to tap into ESMS's field experience and expertise in the customization of TAC's energy management system, On-site.  Those discussions led Larry and Bill to conclude that they did not want to enter into another agreement to distribute another company's product, but rather to have ESMS create and sell its own product.

18.     Based on the decade of valuable field experience, Larry and Bill knew that ESMS's new product must have features such as a high input/output capacity, the capability to self-diagnose HVAC systems and to change HVAC settings, automatic savings tracking, flexibility for holiday schedules, the ability to change fan and delay times, and be visibly pleasing and easy to use.  They named their product Ektos, with the plan that Ektos would have all of these features, and be based around a programmable personal computer instead of a hardware controller, so that the user and/or ESMS could change almost anything they wanted in order to create a comfortable, energy efficient environment for the facility.

19.     Larry and Bill knew what they wanted and how the product should operate.  What they needed was help in creating the software element of the Ektos product around their specifications and with their significant input.

COMPLAINT - 4

1        **ESMS Hires the Hickner Brothers to Help Develop Ektos and Ektos Live**

2        20.     An answer turned out to be rather close to home, as Bill Hickner's son Jason

3    was a software developer.  Larry, acting President of ESMS at the time, also knew Jason

4    Hickner through the business and the friendly relationship he had with Bill Hickner.

5        21.     Larry and Jason's business relationship dated back to 1997, in conjunction

6    with a company called Rail Supermedia, which developed a remote user screen enabler and

7    multiple tab viewing capable web page.  Larry assisted in the accounting functions and

8    authored a business plan for Rail Supermedia.  The company sought investors but the late

9    1997 tech bubble thwarted those efforts.  Larry's $50,000 investment in Rail Supermedia was

10   lost and his business relationship with Jason ultimately lasted only 2 to 3 months, as the

11   company dissolved in 1997.

12       22.     In late 2006 and early 2007, Jason was under financial stress and unemployed

13   after one of his projects had gone sour and he ended up personally on the hook for former

14   employee back-taxes.  Jason working for ESMS seemed a win-win.  Jason needed the money

15   and had the time; ESMS had a developer who Larry believed he could teach, with Bill's

16   assistance, what ESMS needed and who would have the best interests of his new employer,

17   including his father, Bill, at heart.

18       23.     ESMS thus made what seemed to be the logical decision to hire Jason to help

19   create its new in-house custom product, Ektos.  While Jason had no experience in the QSR

20   industry or in the energy management industry for QSRs, Larry and Bill had years of practical

21   experience and know-how to share.  Bill also had significant technical expertise to contribute

22   to the project.

23       24.     ESMS employees, including Larry and Bill, instructed Jason on the design of

24   Ektos, taking advantage of their extensive experience in the QSR industry and with the ECS

25   controller.  Jason, under the direction of ESMS, specifically Bill Hickner, and with the

26   assistance of several other ESMS employees, began to code the software component of the

COMPLAINT - 5

1  Ektos product.  Neither Jason nor Ryan substantially contributed to development of the

2  hardware components of the Ektos product.

3      25.    Jason received his first paycheck ($5,000) for his initial coding efforts on

4  March 2, 2007.  Jason's work on the software component, in collaboration with and under the

5  direction of ESMS employees, continued through the spring of 2007.  ESMS continued to pay

6  Jason a salary of $5,000 per week through July 30, 2007, by which time ESMS had paid Jason

7  $67,500 for his services.

8      26.    At Bill Hickner's recommendation, ESMS hired Jason's brother Ryan to assist

9  with Ektos in April 2007.  While Ryan already had a full-time job with Hornall Anderson

10  Design Works in Seattle, he provided services to ESMS evenings and weekends.  Ryan

11  received his first monthly paycheck ($2,000) from ESMS for his work on Ektos on April 9,

12  2007.  ESMS continued to pay Ryan at a salary of $2,000 per month until July 27, 2007.

13  ESMS's totally payments to Ryan were $7,000.

14      27.    In addition to paying Ryan's and Jason's salaries, and the salaries of the ESMS

15  staff who helped direct, develop, assemble and install the Ektos prototype system, ESMS paid

16  for all hardware and associated costs of the Ektos system, a combination of hardware and

17  software custom designed by ESMS, software coded by the Hickner Brothers, and third party

18  components; e.g., HVAC controllers, integrated into the system.

19      28.    ESMS installed the first Ektos prototypes at two McDonald's restaurants in

20  June 2007, and installed the first production model Ektos system at a Boston area McDonald's

21  restaurant in October 2007.

22      29.    In August 2007, the Hickner brothers formed defendant VaryWell.  At Jason's

23  request, beginning in August 2007, ESMS began making weekly payments to VaryWell for

24  Jason's and Ryan's support and development work.

25      30.    From November 2007 until March 2009, based on feedback and instructions

26  from ESMS, VaryWell completed minor adjustments to the software component of the Ektos

COMPLAINT - 6

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580

system.  With the assistance of VaryWell, ESMS also developed a complementary product for Ektos, called Ektos Live, between April 2008 and July 2008.  Ektos Live provides customers and ESMS with the ability to easily access and modify Ektos system settings remotely.  Ektos Live was a new, improved form of ESMS's previous remote-access system Logmein, a modified form of a third party control product.  Ektos Live was meant to provide the same functions as Logmein, but with an easy-to-use graphical interface.

31.    ESMS continued to pay VaryWell weekly through March 2009.  On April 2, 2009, reflecting the downturn in the economy, ESMS wrote VaryWell an email instructing VaryWell to discontinue its work for ESMS due to its financial condition and its ability to only pay its own operational, sales, installation, product costs and office overhead expenses. ESMS discontinued its weekly payments to VaryWell.

32.    From September 2008 to October 19, 2009, VaryWell produced no work history or invoices for ESMS.  Nevertheless, on October 19, 2009, notwithstanding ESMS's earlier instructions to stop work, VaryWell demanded $310,000 payment for services purportedly rendered, dating back to October 2007 and allegedly extending to the date of the invoice.

33.    In response to a threat from VaryWell to shut down Ektos Live and disrupt ESMS's business services to its customers without notice, ESMS made additional payments to VaryWell in December 2009.

34.    ESMS paid VaryWell approximately $189,000 between August 2007 and December 2009.  All told, ESMS paid VaryWell and the Hickner Brothers approximately $263,000.

### ESMS's Major Business Development Efforts

35.    ESMS paid for and supervised all sales and marketing efforts for its Ektos system.  In September 2007, ESMS's Sales Director, Tom Hopper, created a presentation describing Ektos as an ESMS system.  ESMS personnel widely used the presentation during

COMPLAINT - 7

1  their subsequent systems sales efforts. Despite being well aware of the presentation and its

2  use, neither Bill Hickner nor the Hickner Brothers ever challenged its accuracy.

3      36.    Under the direction of Larry Barich, acting in the role of chief of ESMS sales

4  and operations, and using Tom's presentation and through the efforts of ESMS's sales force

5  and installation teams, ESMS installed its Ektos system in numerous QSR locations. ESMS

6  personnel modified and configured the Ektos system in various ways to meet the needs of

7  each customer and location.

8      37.    Taking advantage of a personal connection, Tom Hopper initiated

9  communications in September 2008 with IBM in conjunction with an ESMS pitch to

10  McDonald's Canada. ESMS knew that, because of its small size, it needed to partner with a

11  larger and respected company. IBM became that partner, but only after conducting an

12  extensive due diligence of ESMS, including confirming that it owned and had the ability to

13  deliver the Ektos system to customers. Bill, Jason and Ryan were intimately involved in

14  responding to the questions posed by IBM during its due diligence. Consistent with their

15  historic acquiescence on the subject and ESMS's own beliefs regarding the ownership of

16  Ektos system, at no time during IBM's effort did the Hickners raise any questions regarding

17  or claim ownership of any element of the Ektos product. IBM was satisfied with its due

18  diligence of ESMS, and in October 2008, executed a Customer Agreement and a Non-

19  disclosure Agreement with ESMS, which formed the contractual basis for the partnership

20  between the two companies.

21      38.    Together, ESMS and IBM responded to a McDonald's Canada RFP on

22  November 10, 2008. McDonald's Canada awarded the contract to the ESMS-IBM

23  partnership in December 2008.

24      39.    Shortly thereafter, in December 2008, McDonald's USA overruled the contract

25  awarded by McDonald's Canada. In particular, McDonald's USA stated that ESMS was not a

26  nationally approved supplier for McDonald's USA, and therefore could not be awarded a

COMPLAINT - 8

1    contract with McDonald's Canada.  Around the same time, ESMS submitted an application

2    for the process of obtaining McDonald's USA National Approval Status in an effort to

3    reinstate ESMS's contract with McDonald's Canada.  McDonald's Worldwide also required

4    ESMS and IBM to respond to an RFP for McDonald's Worldwide.  The partners were

5    excused from the McDonald's Worldwide RFP and ESMS was denied McDonald's USA

6    National Approval Status in August 2009.

7        40.    In June 2009, Bill Hickner and the Hickner Brothers helped submit an ESMS

8    bid to supply its Ektos system to Starbucks.  ESMS asked IBM to serve as the lead on the bid

9    because of its worldwide provider reputation.  Again, at no time during the Starbucks effort

10   did Bill Hickner or the Hickner Brothers suggest to ESMS, IBM, or Starbucks that ESMS did

11   not own the Ektos software, even in response to Starbuck's written RFP question about

12   ownership of the product.  In July 2009, Starbucks awarded the bid to one of ESMS's

13   competitors.

14       41.    Also in the summer of 2009, Larry Barich became learned that, Bill Hickner

15   had promised his sons 50% of his ESMS stock in April 2009.

16       42.    IBM and ESMS continued their relationship and began pitching to IBM

17   customers in Mexico.  Proposals were made to ComExtra and Caliente in Mexico, which

18   resulted in pilot stores, and hopes of a long-term contract, which remains pending.  Pitches

19   were also made to Sobeys and TD Canada Trust in Canada.

20       43.    Bill Oliphant, IBM's project lead, scheduled a meeting with TD Canada Trust

21   on December 14, 2009.  The goal of the meeting was to secure a 1,000 store installation

22   project through TD's branches.

23       44.    While ESMS and IBM continued their attempts to obtain a contract with a

24   major small commercial building chain, conflicts arose between ESMS and VaryWell.  In

25   particular, after the Starbucks rejection in July 2009 and the McDonalds rejection in August

26   2009, the Hickner Brothers' enthusiasm and hope for a continued successful partnership with

COMPLAINT - 9

ESMS appeared to dwindle.

45.    A year into the partnership with IBM, in late September 2009, Ryan Hickner accompanied Bill Hickner to visit IBM headquarters to discuss details of two potential projects with IBM.  During this trip, Ryan advised Bill Oliphant that IBM deal directly with VaryWell, and not with ESMS.  In response, Bill Oliphant advised Ryan that all IBM dealings were to remain with ESMS and not VaryWell.  Ryan did not tell Oliphant during this trip that VaryWell contested ESMS's ownership of Ektos or Ektos Live.

## VaryWell Asserts Ownership of Ektos and Intentionally Disrupts ESMS's Business; Bill Hickner Undermines ESMS's Business

46.    On October 19, 2009, VaryWell wrote an email to ESMS demanding $310,000 for work allegedly performed by VaryWell on ESMS's behalf.  As previously noted, the October 19, 2009 invoice was the first invoice ESMS received from VaryWell since September 5, 2008.

47.    More significantly, VaryWell claimed, for the first time, full ownership of the Ektos and Ektos Live software, and demanded, again for the first time, that that ESMS take a license from VaryWell for the products. VaryWell went on to also demand 30% of any revenue ESMS received upon sale of the company.

48.    Separately, Bill Hickner wrote an email to Larry Barich stating that the Hickner Brothers wanted a contribution of Larry Barich's ESMS stock (the result of which would be VaryWell's control of ESMS).

49.    The timing of the demand, namely, with other IBM deals in the works, was no coincidence. The defendants clearly sensed that they had and decided to use their perceived leverage over ESMS. While Larry tried to reach some accommodation to evolving VaryWell and Hickner Brothers demands, the parties failed to resolve their dispute.

50.    On November 23, 2009, openly declaring his support for VaryWell over ESMS, Bill Hickner sent documentation for ESMS's proposed IBM kitchen pilot project on

COMPLAINT - 10

1   VaryWell letterhead.  In other words, Bill sought to remove ESMS from the deal,

2   notwithstanding his position as president and a shareholder of ESMS. In response, IBM asked

3   that the proposal be resent on ESMS letterhead, and reiterated at that time that IBM was only

4   willing to deal with ESMS and wanted no direct relationship with VaryWell.

5       51.     On December 4, VaryWell sent an e-mail to ESMS threatening to shut down

6   Ektos if the payment VaryWell demanded was not received.

7       52.     Negotiations between ESMS and VaryWell continued.  A Memorandum of

8   Understanding ("MOU") was circulated between the parties, the last draft of which included a

9   proposal for VaryWell to be paid the greater of $138,000 or 30% of the net proceeds upon a

10  sale of ESMS.  ESMS in turn would be able to hold the Ektos source code in escrow and

11  move forward with its partnership with IBM.

12      53.     The dispute seemed over when Bill Hickner left a voicemail for Larry Barich

13  on December 8, 2009, stating that VaryWell felt that the parties were close to agreement on

14  the terms of the MOU, with exception that the $138,000 payment called for in the MOU was

15  in addition to the $310,000 that VaryWell claimed it was owed.

16      54.     Notwithstanding Bill's statement regarding the progress made by ESMS and

17  VaryWell, on December 10, 2009, Ryan Hickner wrote an email to Bill Oliphant at IBM

18  stating that VaryWell owned Ektos and that ESMS was merely a licensee of the software.

19  Ryan's email directly conflicted with VaryWell's position in its negotiations with ESMS.

20  Indeed, Ryan's email was at complete odds with the historic relationship between the parties,

21  including literally years of VaryWell/Hickner acquiescence to ESMS's very public claims of

22  ownership of the Ektos system.

23      55.     Bill Oliphant responded that IBM did not want to be involved in the internal

24  disputes between ESMS and VaryWell, and again reiterated that the IBM partnership was

25  with ESMS exclusively.  Bill Oliphant cancelled his December 14 scheduled meeting with

26  TD Canada due to the questions VaryWell raised regarding ownership of the Ektos software.

COMPLAINT - 11

1    Thus, ESMS's relationship with IBM was very much in jeopardy.

2        56.    Things did not get any better when, on December 10, 2009, in an effort to

3    support VaryWell's attempts at driving a wedge between ESMS and IBM, Bill Hickner wrote

4    an email to Bill Oliphant stating that "the shelf life of the existing Ektos software is near the

5    end" and that VaryWell, rather than ESMS, could provide the solutions to IBM's goals.

6        57.    IBM has stated that it cannot continue its relationship with ESMS unless

7    ESMS owns the Ektos software and controls the associated source code, so that IBM and

8    ESMS can confidently market and install Ektos in any facility that is Ektos compatible, such

9    as a small retail commercial building.  Ektos would remain the system component to the total

10    IBM solution, which would also include other systems which are meant to enhance control of

11    a large building enterprise.

12        58.    ESMS continued to respond in good faith to VaryWell's changing demands to

13    salvage ESMS's important partnership with IBM.  After several days of exchanging drafts of

14    memoranda of understanding, on December 14, 2009, ESMS held a conference call with the

15    Hickner Brothers.  During the course of the conversation, the Hickner Brothers declared that

16    they were not bound by the earlier MOU, reiterated their claims of ownership of the Ektos

17    software, and asserted they were unwilling to provide the Ektos software source code to

18    ESMS.

19        59.    During Christmas week 2009, Bill Hickner verbally and in writing resigned

20    from his position as president of ESMS, and in yet another example of his apparent

21    willingness to harm ESMS, deleted or otherwise destroyed all emails within his ESMS-

22    provided email account (maintained by the California-based company Google).  ESMS has

23    taken substantial efforts to restore that account, which have so far proven ineffective.

24        60.    After repeatedly stating that his earlier message and writing should not be

25    treated as a resignation, Bill formally resigned as president of ESMS in a letter dated January

26    6, 2010.

COMPLAINT - 12

1    61.    Bill Hickner again resigned as president of ESMS on January 6, 2010, this

2  time in a formal letter he emailed to ESMS's corporate counsel.  The same day, he announced

3  that "[i]n the next few months I will bring to market a completely new BMS system.  This

4  was my plan within ESMS and will continue to be my plan outside of ESMS."  In other

5  words, Bill announced that he was going to go into competition with ESMS using information

6  and presumably documentation he gleaned or developed while an ESMS employee, officer

7  and director.

8    62.    ESMS can only assume that Bill plans to go into business with his sons, the

9  Hickner Brothers, and that they will be using technology, including software, owned by

10  ESMS.

**BASIS FOR DERIVATIVE SUIT**

12    63.    Plaintiff Larry Barich was a shareholder of ESMS at all times relevant to the

13  occurrences described herein.

14    64.    This shareholder derivative action is not a collusive one to confer jurisdiction

15  that the Court would otherwise lack.

16    65.    Larry Barich did not present a formal demand to the ESMS board of directors

17  to bring this action, as such demand would be futile.  At the time of filing, ESMS has two

18  directors: Plaintiff Larry Barich and Defendant Bill Hickner.  As described in detail above,

19  Bill Hickner lacks independence towards, is biased regarding, and has personal and pecuniary

20  interests in the corporate issues this action seeks to address.  Demand upon the board would

21  have resulted in deadlock.

**COUNT I:**
**DECLARATION OF AUTHORSHIP AND OWNERSHIP**
**OF A COPYRIGHTED WORK**
**(AGAINST VARYWELL AND THE HICKNER BROTHERS)**

25    66.    Plaintiff repeats and hereby incorporates herein by reference, as though

26  specifically pleaded herein, the allegations set out above.

COMPLAINT - 13

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580

67.    An actual and justiciable controversy exists between ESMS, on the one hand, and VaryWell and the Hickner Brothers, on the other hand, regarding the authorship and ownership of Ektos and Ektos Live software.  These parties have genuine and opposing interests, which are direct and substantial, and of which a judicial determination will be final and conclusive.

68.    ESMS is entitled to a declaratory judgment that (i) ESMS is a joint author of Ektos and Ektos Live software; and (ii) ESMS enjoys joint ownership of Ektos and Ektos Live software.

## COUNT II:
## DECLARATION OF IRREVOCABLE LICENSE OF A COPYRIGHTED WORK
## (AGAINST VARYWELL AND THE HICKNER BROTHERS)

69.    Plaintiff repeats and hereby incorporates herein by reference, as though specifically pleaded herein, the allegations set out above.

70.    An actual and justiciable controversy exists between ESMS, on the one hand, and VaryWell and the Hickner Brothers, on the other hand, regarding the scope of ESMS's license to Ektos and Ektos Live software.  These parties have genuine and opposing interests, which are direct and substantial, and of which a judicial determination will be final and conclusive.

71.    ESMS is entitled to a declaratory judgment that ESMS enjoys an irrevocable nonexclusive unlimited license to Ektos and Ektos Live software.

## COUNT III:
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS
## AND BUSINESS EXPECTANCIES
## (AGAINST ALL DEFENDANTS)

72.    Plaintiff repeats and hereby incorporates herein by reference, as though specifically pleaded herein, the allegations set out above.

73.    ESMS had valid contractual relationships with IBM and valid business expectancies with potential ESMS Ektos clients.

COMPLAINT - 14

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580

74.    Defendants knew of such valid contractual relationships and business expectancies.

75.    Defendants acted with intent to cause a breach or termination of the contractual relationships or expectancies.

76.    Defendants interfered for an improper purpose and/or used improper means.

77.    Defendants' acts constitute tortious interference with contractual relationships and tortious interference with business expectancies, both in violation of the common law of Washington.  Defendants' tortious interference directly and proximately has and continues to cause damage to ESMS in an amount to be determined at trial.  In addition, defendants' tortious interference will cause irreparable damage, loss and injury to ESMS, for which ESMS has no adequate remedy at law.

### COUNT IV:
### MISAPPROPRIATION OF TRADE SECRETS
### (AGAINST ALL DEFENDANTS)

78.    Plaintiff repeats and hereby incorporates herein by reference, as though specifically pleaded herein, the allegations set out above.

79.    Defendants have misappropriated ESMS's confidential information, including designs and specifications, business plans, projections, and forecasts, market research, and customer information.

80.    The confidential information misappropriated by Defendants constitutes trade secrets in that they (a) are compilations, methods, techniques, patterns, programs and processes of information that derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure; and (b) ESMS has made, and continues to make, reasonable efforts to maintain their secrecy.

81.    Defendants have and intend to disclose and/or use ESMS's trade secrets without ESMS's express consent and with the knowledge that these trade secrets were

COMPLAINT - 15

1 | acquired under circumstances giving rise to a duty to maintain their secrecy.

2 |      82.     Defendants' misappropriation of ESMS's trade secrets was willful and

3 | malicious.

4 |      83.     The misappropriation of ESMS's trade secrets violates the Uniform Trade

5 | Secrets Act, as adopted by Washington in RCW Ch. 19.108.

6 |      84.     Defendants' misappropriation directly and proximately has and continues to

7 | cause damage to ESMS in an amount to be determined at trial.  In addition, the

8 | misappropriation will cause irreparable damage, loss and injury to ESMS, for which ESMS

9 | has no adequate remedy at law.

10 |
11 | **COUNT V:**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST BILL HICKNER)**

12 |      85.     Plaintiff repeats and hereby incorporates herein by reference, as though

13 | specifically pleaded herein, the allegations set out above.

14 |      86.     Bill Hickner owed fiduciary duties to ESMS and to its shareholders as a

15 | shareholder, director, and officer of ESMS.  These duties include a duty of loyalty and care,

16 | avoiding secret profits, self-dealing and conflicts of interest, and an obligation to deal with

17 | ESMS and its shareholders with the utmost good faith.

18 |      87.     Bill Hickner breached his fiduciary duties to ESMS and its shareholders by

19 | treating ESMS's corporate assets as his own and his family's, by taking and advancing

20 | positions contrary to ESMS's interests, by advancing the interests of VaryWell and the

21 | Hickner Brothers to the detriment of ESMS, and by utilizing ESMS resources and trade

22 | secrets to develop a system competitive to Ektos, among other things.

23 |      88.     Bill Hickner's breach of his fiduciary duties directly and proximately has and

24 | continues to cause damage to ESMS in an amount to be determined at trial.  In addition, his

25 | continued breach of fiduciary duties will cause irreparable damage, loss and injury to ESMS,

26 | for which ESMS has no adequate remedy at law.

COMPLAINT - 16

**COUNT VI:**
**UNFAIR COMPETITION UNDER LANHAM ACT § 1125**
**(AGAINST ALL DEFENDANTS)**

89.    Plaintiff repeats and hereby incorporates herein by reference, as though specifically pleaded herein, the allegations set out above.

90.    Defendants' statements to IBM regarding ownership of Ektos and Ektos Live constitute uses in commerce of words, terms, names, symbols, and devices, and false or misleading representations of fact, and are likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, association between VaryWell and ESMS, and as to the origin, sponsorship, or approval of VaryWell's goods, services, and commercial activities by ESMS.

91.    Defendants willfully violated 15 U.S.C. § 1125(a). Their conduct directly and proximately has and continues to cause damage to ESMS in an amount to be determined at trial. In addition, defendant's conduct, if continued, would cause irreparable damage, loss and injury to ESMS, for which ESMS has no adequate remedy at law.

**COUNT VII:**
**UNFAIR COMPETITION UNDER RCW Ch. 19.86**
**(AGAINST ALL DEFENDANTS)**

92.    Plaintiff repeats and hereby incorporates herein by reference, as though specifically pleaded herein, the allegations set out above.

93.    Defendants' statements to IBM regarding ownership of Ektos and Ektos Live constitute unfair or deceptive acts or practices. These statements were made in the course of trade or commerce and directly and proximately caused ESMS substantial damage. The public interest has been affected by Defendants' conduct.

94.    Defendants' conduct violates RCW Ch. 19.86. Their conduct directly and proximately has and continues to cause damage to ESMS in an amount to be determined at trial. In addition, defendant's conduct, if continued, would cause irreparable damage, loss and injury to ESMS, for which ESMS has no adequate remedy at law.

COMPLAINT - 17

1

2

### COUNT VIII:
### COMMON LAW UNFAIR COMPETITION
### (AGAINST ALL DEFENDANTS)

3

4

95.     Plaintiff repeats and hereby incorporates herein by reference, as though

specifically pleaded herein, the allegations set out above.

5

6

96.     Defendants have committed various unfair, misleading and deceptive actions,

including without limitation: (a) attempting to undermine, appropriate for its own use, or

7

otherwise corrupt ESMS's long-standing business relationship with IBM;

8

(b) misappropriation of ESMS's confidential information and trade secrets; (c) making

9

misleading comments IBM about ESMS and the Ektos system; and (d) failing to raise any

10

claims of ownership rights in the Ektos source code during IBM's extensive due diligence

11

process of ESMS.

12

97.     Defendants' practices hinder rather than promote the efficient operation of the

13

market and interfere in substantial manner with the ability of prospective purchasers to choose

14

on the merits of competing products.

15

98.     Defendants' actions constitute unfair competition under the common law of

16

Washington.  Their conduct directly and proximately has and continues to cause damage to

17

ESMS in an amount to be determined at trial.  In addition, defendant's conduct, if continued,

18

would cause irreparable damage, loss and injury to ESMS, for which ESMS has no adequate

19

remedy at law.

20

21

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor and against defendants as

22

follows:

23

24

1.     For declaratory judgment that:

25

(a)     ESMS is a joint author of Ektos and Ektos Live software; and

26

(b)     ESMS enjoys joint ownership of Ektos and Ektos Live software;

COMPLAINT - 18

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580

2.    For declaratory judgment that ESMS enjoys an implied irrevocable nonexclusive unlimited license to Ektos and Ektos Live software;

3.    For preliminary and permanent injunctive relief, requiring VaryWell and the Hickner Brothers to provide to ESMS the source code for Ektos and Ektos Live software;

4.    For preliminary and permanent injunctive relief, enjoining VaryWell and the Hickner Brothers, and their agents, officers, employees, representatives, successors, assigns, attorneys and all other persons acting for, with, by, through or under authority from the defendants, from:

    (a)    asserting to anyone that ESMS does not own or have an unlimited irrevocable license to Ektos and Ektos Live software;

    (b)    asserting to anyone that any entity or person besides ESMS is the sole owner or licensee of Ektos and Ektos Live software; or

    (c)    misappropriating, using, or disclosing ESMS's trade secrets or technology;

5.    For preliminary and permanent injunctive relief, enjoining Bill Hickner and his agents, officers, employees, representatives, successors, assigns, attorneys and all other persons acting for, with, by, through or under authority from him, from:

    (a)    asserting to anyone that ESMS does not own or have an unlimited irrevocable license to Ektos and Ektos Live software;

    (b)    asserting to anyone that any entity or person besides ESMS is the sole owner or licensee of Ektos and Ektos Live software;

    (c)    misappropriating, using, or disclosing ESMS's trade secrets;

    (d)    breaching his fiduciary duty to ESMS; or

    (e)    accessing any computer or computer system controlled by, assigned to, or maintained for ESMS without ESMS's express authority;

6.    For damages, including actual damages, defendants' profits, disgorgement,

COMPLAINT - 19

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580

1    restitution or other compensation or monetary remedy, according to proof;

2         7.     For exemplary damages, as provided under RCW 19.108.030(2);

3         8.     For treble damages, as provided under RCW 19.86.090;

4         9.     For an award of attorney's fees and costs; and

5         10.    For such and other further relief that the Court deems just and proper.

6                              **DEMAND FOR JURY TRIAL**

7    ESMS respectfully requests a trial by jury of all issues triable by a jury.

8    Dated: January 13, 2010                    Respectfully submitted,

9

10                                              K&L GATES LLP

11

12                                              By /s/ Daniel H. Royalty
                                                   Allen J. Baden, WSBA # 41169
13                                                 Daniel H. Royalty, WSBA # 31504
                                                925 Fourth Avenue, Suite 2900
14                                              Seattle, Washington 98104-1158
                                                tel.:   206-370-7900
15                                                      206-370-6746
                                                e-mail:   allen.baden@klgates.com
16                                                        dan.royalty@klgates.com

17                                              Attorneys for Plaintiff
18                                              LARRY BARICH, a shareholder, on behalf
                                                of ENGINEERING SERVICE
19                                              MANAGEMENT SYSTEMS, INC., a
                                                Washington Corporation
20

21

22

23

24

25

26

COMPLAINT - 20

**VERIFICATION**

I, Larry Barich, verify:

I am the Plaintiff in the above-entitled action. I was a shareholder of ESMS at all relevant times described in the above Complaint. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge I believe those allegations are true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. Having received a copy of this complaint and having reviewed it with my counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of January 2010 at Mukilteo, WA.

_____
Larry Barich

COMPLAINT - 21

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580